**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| ANTOINETTE TAKIA BELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-01171-TWP-MJD |
| | ) | |
| ARDAGH GROUP S.A., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal of Civil Procedure 56 by Defendant Ardagh Glass Inc. ("Ardagh")[1] (Filing No. 57). Following termination of her employment, *pro se* Plaintiff Antoinette Takia Bell ("Bell") sued Ardagh for race discrimination under Title VII, and state law claims for defamation, and for discontinuing her insurance benefits and failing to provide her with adequate information regarding continued medical coverage (Filing No. 1 at 2). For the following reasons, Ardagh's Motion for Summary Judgment is **granted.**

## I.    BACKGROUND

The following facts are not necessarily objectively true; the Court, as required by Federal Rule of Civil Procedure 56, presents them in the light most favorable to Bell as the non-moving party and resolves all factual disputes in her favor. *See Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Ardagh produces glass packaging (Filing No. 58-3 at 2). Beginning in 2015, both Ardagh's Accounts Receivable ("AR") and Accounts Payable ("AP") functions were managed by Mary

---

[1] Ardagh contends that it has been "incorrectly identified as Ardagh Group S.A." (Filing No 57 at 1.)

Lynn Scalf ("Scalf"), who had been with the company since 1989. In May 2017, Scalf stepped away from managing AR and began focusing solely on managing the AP process. *Id.* As a result, Greg Perry (the Vice President of Finance and Accounting) ("Perry"), promoted Michelle Gibson ("Gibson"), who had been working for the company since 2009, to a role that included managing the AR department. *Id.* That year, Scalf informed Ardagh that she intended to retire in January 2018, and Ardagh began searching for a new AP manager. *Id.* at 3. At no point did Gibson apply for or show interest in the AP manager position. *Id.*

Bell, an African American woman, was eventually hired for the AP manager position and started work on August 7, 2017, reporting directly to Perry. *Id.* Bell believed that the "position was to take over the job functions" of Scalf, (Filing No. 58-1 at 8). Prior to Bell's hiring, the AP manager position at Ardagh had never been held by a racial minority (Filing No. 61-1 at 5). After Perry promoted Gibson in December 2017, Gibson assumed oversight of the AP department and instead of Perry, Gibson became Bell's direct supervisor (Filing No. 58-3 at 3). Gibson's new position had not been posted or open to applicants, and Bell did not have the opportunity to apply (Filing No. 61-1 at 5).

Bell, in her role as AP manager, had one direct report—Kathy Wardlow ("Wardlow"), a Caucasian woman serving as the AP Supervisor (Filing No. 58-1 at 8). Though all the other employees working on AP functions reported directly to Wardlow, Bell, as AP Manager, had the authority to hire and fire employees in the AP department. *Id.* at 8–9.

In December 2017 and January 2018, Bell, who had been working at Ardagh for approximately five months, addressed several department and employee performance issues, first via email and then during a staff meeting (Filing No. 58-3 at 3-4). In an email sent on December 28, 2017, Bell stated to two AP employees that because of "obvious neglect of attention to detail,

[she had] spent 3 hours [a ]night sorting through and attempting to process invoices that [were] already in the system", that her prior "request [fell] on deaf ears", and that she did "**NOT HAVE TIME TO DUPLICATE WORK – PERIOD!!!!**" (Filing No. 61-1 at 94 (emphasis in original).)

In the later meeting on January 17, 2018, Bell—with what she calls "passion"—addressed "inappropriate conversation in the workplace" concerning her allegedly hiring her friends and her "picking on" AP employees (Filing No. 58-1 at 15–16, 18). Some AP employees, including Wardlow, felt that Bell, through the email and meeting, had threatened their jobs or was rude (Filing No. 58-3 at 3–4). As a result, Perry and Gibson, who agreed that Bell had been unprofessional and disrespectful, placed Bell on a verbal notice for unprofessional behavior and asked her to apologize to her team "in an effort to reestablish good morale in the department." *Id.* at 4. Bell later apologized, and two AP employees thanked her for the apology (Filing No. 61-1 at 95). Bell's formal apology stated that "the verbiage used in [her] last meeting may have been taken out of context thus offending some people," but that "[t]he goal of the meeting was to stress the importance of working together as cohesive unit and not spend our time talking about one another or painting another person in a negative light." *Id.*

On April 23, 2018, Ardagh hired Eric Rossie ("Rossie") as VP of the North American Business Services (Filing No. 58-4 at 2). Before Rossie's hire, several important vendors and suppliers had begun to complain that their invoices were not being paid on time. *Id.* As a result, Rossie was tasked by Ardagh's CEOs to investigate the source of the problems in the AP department. *Id.* at 3. Shortly after his hiring, Rossie asked Bell to meet with him to "discuss the breakdown in the AP process," but Bell declined to meet with him until over two weeks later, telling him she was unavailable until May 15, 2018. *Id.* At no point, however, did Rossie check

Bell's calendar to see if she was being truthful about her availability, nor did he schedule a meeting himself.

On April 25 and 26, 2018, Bell and her team attended a team-building training provided by Emergenetics, an outside vendor, and hosted by trainer Randy Emelo ("Emelo"), (Filing No. 58-7 at 2). Bell brought her laptop and worked during the training (*Id*. at 2-3). Emelo found Bell's actions to be so distracting that he addressed the issue to Gibson during a break in the training. *Id.* Gibson later relayed Emelo's feedback to Rossie.(Filing No. 58-4 at 3.)

A few weeks later, on May 2, 2018, Amber Ward, the Director of Talent Acquisition, received an email from a key vendor regarding past due invoices totaling roughly $240,000.00. *Id.*; Filing No. 58-5 at 19. The email stated that the vendor had been unsuccessful in meeting with Bell: she had been unable to join a first scheduled telephone conference and failed to join the rescheduled call that had been scheduled around her availability. The vendor reported that Bell's unavailability was "quite disappointing and concerning" and indicated that the issue would "impact our ability to continue our support to Ardagh." (Filing No. 58-5 at 19.) After Gibson addressed the issue with her, Bell exchanged multiple emails with the vendor to resolve the issue. *Id*. at 18; Filing No. 61-5 at 20.

As a result of Rossie's observations of Bell—her failure to meet with him until weeks after he requested, her setting a bad example for her team by working throughout a team-building training, and her failure to join multiple telephone calls with one of Ardagh's key vendors even though one of the calls was scheduled around her availability—Rossie concluded that Bell was "an ineffective manager who needed to be replaced." (Filing No. 58-4 at 4.) On May 7, 2018, Bell was informed of Rossie's decision to terminate her employment, effective that day (Filing No. 58-1 at 19). After she was terminated, Bell was replaced by Donna Doty, a Caucasian woman. *Id.*

Bell believes that she was terminated because of her race, and not for her "performance," as was stated to her by Ardagh management (Filing No. 62-3 at 3). Specifically, she contends she was subjected to "racial microaggressions" from Wardlow and Scalf and that Ardagh's management failed to address these concerns (Filing No. 61 at 2). Some of the racial microaggressions said to Bell or reported to Bell by other African-American employees, included Wardlow's message to another co-worker identifying another employee as "the black girl with short hair" and that she [Wardlow] was not able to "bring a black man home to my parents"; and a different message to another co-worker referring to Bell as "ganster" (*i.e.*, gangster), (Filing No. 61-1 at 20, 22) (Filing No. 62-1 at 3). Bell was also "repeatedly accused of 'knowing,' and 'being related to' any African-American within the department." (Filing No. 61 at 2–3.) On the other hand, Bell received a raise, got "kudos" from upper Ardagh management, and "improved statistics for the AP Department." (Filing No. 58-1 at 26.)

Upon termination, Bell's health insurance benefits—which she had elected to obtain through Ardagh when she was hired—were discontinued, pursuant to company policy, on her last day at midnight (Filing No. 58-6 at 2). To cover Bell's health insurance through May 7, 2018 (the date of her termination), Ardagh withheld the employee contribution for the group health plan from her May 15, 2018, paycheck, which encompassed her last day of employment. *Id.* at 2–3. And though Bell received a paycheck on May 22, 2018, Ardagh did not withhold the employee contribution for the group health plan from this final pay. *Id.* at 3. On May 15, 2018, Ardagh's insurance provider sent a Consolidated Omnibus Budget Reconciliation Act ("COBRA") Coverage Election Notice to Bell's address on record at the time of her termination, which Bell never received. *Id.*

Also after Bell's termination, numerous AP processors complained that they were having to process multiple repeat invoices from vendors and that this was causing a lot of additional work for them (Filing No. 58-4 at 4).  Upon learning of the issue, Rossie spoke to the processors, who told him that "they had previously 'obsoleted' the invoices under an invoice 'rejection process,' which had been implemented by Bell in December 2017." *Id*. Rossie then told the processors to "stop obsoleting invoices (which essentially means deleting them from the queue), as that was causing them to get behind on processing and the vendors were going to demand payment even if Ardagh 'rejected' their invoices." *Id*.  Rossie asserts he never told any non-Ardagh employee about Bell's policy of rejecting invoices, nor did he tell any non-Ardagh employee that Bell had deleted invoices or committed fraud.  *Id*.

Bell, *pro se*, filed suit against Ardagh asserting the following claims.  She alleges that Ardagh violated Title VII because "[Ardagh] discriminated against Ms. Bell by not affording her [the] same employment and opportunities as her Caucasian colleagues due to [her] being African American."  (Filing No. 1 at 2.)  Bell also brings two state law claims.  *Id*.  The first is brought under Indiana Code § 27-8-15-31.1, asserting that "[Ardagh] violated Ms. Bell's civil rights by cancelling her medical coverage" even though she had already paid for them, and that "[Ardagh] violated Ms. Bell's civil rights by not providing her with adequate information regarding continued medical coverage." *Id*.  Her final claim is brought under Indiana Code § 34-15-1-1, asserting that Ardagh violated her civil rights by defaming her character "by making false claims regarding the reason of her termination." *Id*.  Ardagh seeks judgment as a matter of  law with respect to all claims brought against it by Bell (Filing No. 57 at 1).

## II.   <u>LEGAL STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). Moreover, "employment discrimination cases are extremely fact-intensive, and

neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

Additionally, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  However, the Court notes that:

> [I]t is also well established that pro se litigants are not excused from compliance with procedural rules. [T]he Supreme Court has never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel[.] Further, as the Supreme Court has noted, in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

*Loubser v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009) (citations omitted).

## III.   DISCUSSION

In her Complaint, Bell alleges that Ardagh, her former employer, discriminated against her under Title VII because of her race, made defamatory statements against her, and violated two state statutes by discontinuing her insurance benefits and failing to provide her with adequate information regarding continued medical coverage.  Ardagh seeks summary judgment on each of Bell's claims arguing the undisputed evidence shows that Bell failed to meet performance expectations, the statements she challenges were not defamatory, and she was not an eligible employee to receive continuing health insurance coverage.  The Court will address each claim in turn.

### A.   Discrimination

Bell contends that, in violation of Title VII, "Defendant discriminated against [her] by not affording her [the] same employment consideration and opportunities as her Caucasian colleagues due to [her] being African American." (Filing No. 1 at 2.) Title VII commands that it is "unlawful

. . . for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1738 (2020).

Under the familiar *McDonnell Douglas* burden-shifting method of determining these cases in the "indirect method," a plaintiff must first show that "(1) [she] is a member of a protected class; (2) [she] performed [her] job to [her] employer's expectations; (3) [she] suffered an adverse employment action; and (4) one or more similarly situated individuals outside [her] protected class received better treatment." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017) (citation omitted). If the plaintiff demonstrates these elements, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action." *Id.* "If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination." *Id.* Additionally, "[a]t the summary-judgment stage, the proper question to ask is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Id.*

Ultimately, the issue in a discrimination case is whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's race, national origin, or other protected class caused the termination or other adverse employment action. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence must be considered as a whole instead of asking whether any piece of evidence proves the claim by itself. *Id.*

It is undisputed that Bell is a member of a protected class and she suffered an adverse employment action. Ardagh's Motion and corresponding briefs focus primarily on the second factor, whether Bell performed her job to Ardagh's expectations. (Filing No. 58 at 10.) Specifically, Ardagh contends that Bell was "terminated for serious performance issues": she failed to promptly meet with Rossie after Rossie requested a meeting; she worked on her laptop during a team-building training session; she failed to attend at least one call with an important vendor regarding a pressing issue despite it being scheduled around her availability; and she was counseled by Perry and Gibson for unprofessional behavior stemming from an email she sent to and a meeting she held with other AP employees. *Id.* at 5, 10. According to Ardagh, "[a]ll of these legitimate performance issues led Rossie to conclude Bell was an ineffective manager and should be replaced." *Id.* at 10.

In response, Bell argues that "Rossie's short observation, is a complete fabrication of the reasons for [her] termination". (Filing No. 61 at 7.) As to Bell's failure to meet with Rossie upon Rossie's request, Bell contends that this meeting was requested in passing and "[a]t no time did Rossie ask Bell for a meeting or request she set one up on his behalf," and "[Rossie did not] check [Bell's calendar] to see if Bell was truthful in her availability nor did he set up the meeting himself." *Id.* at 11. In regard to working on her laptop during the team-building training session, Bell does not deny that this happened. She reports only that "there is evidence that will come from witness testimony proving that Bell was not the only one [working during the training session]"; however, that testimony "is only retrievable during trial as the employees testifying still work for [Ardagh]." *Id.* at 9. As to the missed call with one of Ardagh's key vendors, Bell does not dispute that she missed the call, but states that "[Ardagh] fails to show that just hours after the missed call Bell was exchanging emails with the supplier and working to resolve their account, in which the supplier

thanked Bell for her resolution." *Id*. at 10. Bell maintains that she "was not afforded the opportunity to continue employment, address, or correct any misunderstood performance issues, unlike her equally situated comparators who were afforded continued employment." *Id*. at 16. As for these comparators, Bell argues that she was treated less favorably than Wardlow, Gibson, Scalf, and Doty. *Id.* at 17–22.

In reply, Ardagh asserts that Bell's argument—by focusing on a comparator analysis—"bypasses whether she can show she was meeting Ardagh's performance expectations." (Filing No. 62 at 13.) The Court agrees. When determining whether an employee was performing her duties to the expectation of her employer, "it is the perception of the decisionmaker, not the employee, that is relevant." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir. 1998). Thus, while Bell is free to assert that she was performing to the expectations of her employer, it is the perception of Rossie—the individual who decided to terminate Bell's employment—that is pertinent. Rossie was tasked by Ardagh's CEOs to uncover the source of the issues in the AP department (Filing No. 58-4 at 3). According to Rossie's Declaration, he "made the decision to terminate Bell's employment based on [his] own observations of Bell's leadership and performance issues." (Filing No. 58-4 at 4.) It is not the role of the Court to "question the wisdom of a company's decisions on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946–47 (7th Cir. 2006). Rossie affirmed that the combination of

> (1) Bell declining to meet with me until weeks after I requested a meeting to discuss the AP process; (2) her setting a bad example for her team by working throughout a team building training; and (3) the Manpower email, where Bell failed to join a crucial call with a key vendor it had scheduled around her availability, led me to conclude Bell was an ineffective manager who needed to be replaced.

*Id.* at 3–4.  All these facts are critical to Rossie's determination that Bell was an ineffective manager, and none indicate that Rossie's decision to terminate Bell was based on race.

And although Bell initially contended that she received a "positive" performance review from Gibson and received a raise, Gibson's evaluation actually categorized Bell as "too new to rate" and no evidence suggests that the raise was merit-based or that it was made because of positive work performance. (Filing No. 62 at 18.) In contrast, Ardagh has presented evidence that Bell's bonus was a non-discretionary bonus based on the performance of the Company, not her personal performance.  They argue this evidence does not demonstrate – as Bell contends – that her performance was satisfactory two months prior to her termination. In addition, though Bell maintains that she "is not required to demonstrate she met company expectations to file a claim" under Title VII (Filing No. 61 at 16), the burden is on Bell to prove this element at this summary judgment stage—and she has not.  *See Ferrill*, 860 F.3d at 500.

Concerning the fourth factor, Bell's assertion that she was treated less favorably than Wardlow, Gibson, Scalf, and Doty, Ardagh replies that "Bell's alleged comparators are not similarly situated." (Filing No. 62 at 12–13.)  Ardagh argues that Wardlow is not similarly situated to Bell because Seventh Circuit case law holds that "a supervisor and subordinate are generally not similarly situated to one another, as employers are permitted to hold lower-ranking employees to different standards."  *Id*. at 14 (citing *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365 (7th Cir. 2009).  In reply to Bell's contention that Gibson is a proper comparator because "at one time they both reported to Greg Perry and were 'at the same level,'" Ardagh argues that the two are not comparable because "Gibson was Bell's superior" at the time Bell was terminated. *Id*. at 15–16. Ardagh also contends that Scalf "is not similarly situated with respect to Bell's termination because she had retired by the time Rossie, who made the decision to terminate Bell, was even hired." *Id*.

at 17.  Finally, in regard to Bell's claim that Doty "has had similar performance issues as [Bell]," Ardagh contends that "[t]here is simply no evidence that Doty is similarly situated to Bell."  *Id*. at 17–18.  The Court agrees that these alleged comparators are not similarly situated.

Finally, although Bell experienced insensitive "racial microaggressions" from her co-workers[2], when viewing the evidence in the light most favorable to Bell as the non-moving party, the designated evidence does not support her contention that her race was the reason for her termination; or that Ardagh's proffered reason for her termination was pretextual.  Instead, the evidence shows that Ardagh's proffered reason was its actual and honest belief that Bell was not performing her job expectations.  This proffered reason is a legitimate and non-discriminatory basis for terminating an employee.

Because Bell has not shown that Rossie's decision to terminate her was motivated by anything other than his own observations that Bell was not performing her job expectations, Ardagh's summary judgment motion for the discrimination claim is **granted**.

## B.   <u>Defamation Claim</u>

In her Complaint, Bell alleges the "Defendant violated [her] civil rights by defaming her character by making false claims regarding the reason of her termination." ([Filing No. 1 at 2](#) (citing Ind. Code § 34-15-1-1).)  In particular, Bell was told by former co-workers Julia Ryan ("Ryan") and Joyce Vunerable that Wardlow, "loudly and often stated that Bell deleted invoices," and Rossie and Wardlow "stated that Bell performed this act to several employees on numerous occasions." ([Filing No. 58-1 at 28-29](#).)

---

[2] Title VII's prohibition against discrimination "by employers includes a prohibition against creating a 'hostile or abusive work environment.'" *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (citing *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998)). The Court agrees that employees deserve a workplace where people are respected, treated fairly and equally. However, Bell has not filed a hostile work environment claim.

In Indiana, "[a] defamatory communication is defined as one that 'tends so to harm the reputation of another as to lower [her] in estimation of the community or to deter a third person from association or dealing with [her]." *Melton v. Ousley*, 925 N.E.2d 430 (Ind. Ct. App. 2010) (internal citations omitted).  For a plaintiff to prevail on a defamation claim, the plaintiff must prove four elements: "(1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages."  *Id*.  Additionally, "[t]o impose liability for defamation, a false statement of fact is required [but] truth is a complete defense in civil actions for defamation."  *Id*.

The Indiana Supreme Court has also held that the qualified privilege of common interest "applies to communications made in good faith on any subject in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Dugan v. Mittal Steel USA, Inc.*, 929 N.E.2d 184, 188 (Ind. 2010).  "[T]o defeat application of the privilege, the evidence must show that the speaker lacked any grounds for belief as to the truth of the statements." *Id*.

Ardagh argues that Bell's defamation claim fails because it "relies on hearsay statements made by employees who told [Bell that] Rossie said [Bell] had deleted invoices". (Filing No. 58 at 16.)  Moreover, the purportedly defamatory statements made by Rossie were true and are protected under the common interest qualified privilege, which "protects intracompany communications made in good faith where the speaker has a duty and is making the comments to a person having a common duty." (Filing No. 58 at 17 (citing *Melton v. Ousley*, 925 N.E.2d 430, 437 (Ind. Ct. App. 2010); *Dugan*, 929 N.E.2d at 189).) According to Ardagh, "[b]ecause Rossie's comments were both true and protected by the qualified privilege for intracompany

communications, Bell's defamation is without merit and is subject to summary judgment." (Filing No. 58 at 17.)

In response, Bell argues summary judgment should be denied because Ardagh has only submitted "one declaration from Rossie with regard to Bell's defamation claim", while Bell also alleged that Wardlow defamed her (Filing No. 61 at 27).  According to Bell, "because [Ardagh's] only refute of Bell's defamation claim comes from one of the culprits, they do not have enough for summary judgment." *Id*. Bell points to a declaration from Ryan stating that "[o]n numerous occasions I witnessed Eric Rossie and Kathy Wardlow slander []Bell's name by stating she deleted invoices." *Id.* at 26; Filing No. 61-5 at 23. According to Ryan, "[t]he statements surrounding changing the obsoleting process that [Bell] implemented was made very separate from the blatant statement that [Bell] was deleting invoices." (Filing No. 61-5 at 23.) Bell concludes that if a statement is defamatory *per se*, as she maintains is the case here, damage to a reputation is presumed, and "the jury may award a substantial sum for this presumed harm, even without proof of actual harm." (Filing No. 61 at 27 (citing *Elliott v. Roach*, 409 N.E.2d 661, 683 (Ind. App. 1980).)

Ardagh replies that "Ryan provides absolutely no context for these statements, other than the statements were made 'separate from changing the obsoleting process.'" (Filing No. 62 at 19.) Ardagh, argues that "[m]erely stating Bell deleted invoices is not defamatory, much less *per se* defamatory, as Bell must show Rossie and/or Wardlow accused her of a criminal act or misconduct." *Id*. Further, "Ardagh's system permitted the deletion of invoices . . . so the statement that Bell 'deleted invoices' is not defamatory." *Id*. Ardagh again points to the common interest qualified privilege for intracompany communications, asserting that "there is no evidence that

either Rossie or Wardlow made any comments about the invoice process to individuals outside of the Company." *Id.* at 20.

Ardagh is correct. The statement that Bell deleted invoices is not defamatory, much less *per se* defamatory. Under Indiana law, defamation *per se* "arises when the language of a statement, without reference to extrinsic evidence, constitutes an imputation of (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct." *Dugan*, 929 N.E.2d at 186. Because Ardagh's system permits a user to delete invoices, the statement that Bell deleted invoices merely relates a fact of her conduct at work— not misconduct in her occupation.

Moreover, as argued by Ardagh, "Bell cannot overcome the common interest qualified privilege for intracompany communications". (Filing No. 62 at 20.) Under the standard setting that privilege, the statements made by Rossie and/or Wardlow are protected. Rossie's Declaration states that "after Bell's termination, the AP processors complained they were having to process numerous repeat invoices from vendors" and that this was causing "additional work for the processors." (Filing No. 58-4 at 4.) In searching for the root of the issue, Rossie spoke to the processors, and they told him they "had previously 'obsoleted' the invoices under an invoice 'rejection process,' which had been implemented by Bell." *Id.* Rossie states he told the processors "to stop obsoleting invoices (which essentially means deleting them from the queue), as that was causing them to get behind on processing." *Id.* Further, Rossie asserts that "[he] never told any non-Ardagh employee about Bell's policy of rejecting invoices, nor did [he] ever tell any non-Ardagh employee that Bell had deleted invoices or committed fraud." According to Rossie, "[t]he only conversations [he] had with Ardagh employees about this issue were necessary to convey that

Ardagh would no longer follow the rejection process implemented by Bell because it was causing duplication of work." *Id.*

And the Court finds that Ryan's Declaration fails to provide context for the statements she alleges Rossie and/or Wardlow made ([Filing No. 61-5 at 23](#)).  Ryan's Declaration does not state to whom Rossie and/or Wardlow made these comments, nor does Ryan state that they were made to anyone other than Ardagh employees. *Id.* If anything, Ryan's Declaration bolsters the common interest qualified privilege for intracompany communications when the statements were made only to fellow Ardagh employees who also had an interest in limiting the "duplication of work" as stated by Rossie in his Declaration ([Filing No. 58-4 at 4](#)).  Moreover, Bell has not defeated this privilege because she has not shown that the statements "lacked any grounds for belief as to the truth of the statements." *Dugan*, 929 N.E.2d at 188.  The Court notes that "Rossie testified that he understood the obsoletion process meant invoices were deleted from the queue, based on reports he received from the processors, and Wardlow [confirmed] his understanding" and thus, "any comments made by Wardlow and Rossie that Bell 'deleted invoices' were true and certainty did not 'lack any grounds for belief.'" ([Filing No. 62 at 20](#).)

For the foregoing reasons, the Court **grants** Ardagh's summary judgment motion with respect to Bell's defamation claim.

## C.   <u>Medical Coverage Claim</u>

Finally, Bell alleges that "Defendant violated [her] civil rights by canceling her medical coverage despite [her] already paying for said services" and "by not providing her with adequate information regarding continued medical coverage." ([Filing No. 1 at 2](#) (citing Ind. Code § 27-8-15-31.1).)  Indiana Code subsection 27-8-15-31.1(b) provides, in relevant part, that:

> If an eligible employee who has been employed by the same small employer for at least one (1) year and continuously covered under a health insurance plan for at

least ninety (90) days . . . loses coverage [because of termination,] . . . the individual and any dependents of the individual are entitled to receive continuing coverage from the small employer insurer.

Relatedly, subsection 27-8-15-31.1(c) requires a small employer to "notify an individual of the individual's possible right to continuing coverage under subsection (b) by presenting notice to the individual in writing within ten (10) days after the individual becomes an eligible employee."

Ardagh argues that this claim fails for three reasons. First, "Bell has not established that there is a private right of action to file a lawsuit under Indiana Code § 27-8-15-31.1, as the statute itself does not provide for such a right." (Filing No. 58 at 18 (citing *Shirey v. Flenar*, 89 N.E.3d 1102, 1105 (Ind. Ct. App. 2017)).) Second, Ardagh maintains that as required by the statute, Bell did not work at Ardagh for "at least one year." In addition, while acknowledging that the term is not defined in the statute, Ardagh contends that it does not constitute a "small" employer. *Id.* Third, Ardagh argues that because it has "20 or more employees, any claim that Ardagh failed to notify an employee about continuing healthcare coverage following termination of employment is preempted by the Employee Retirement Income Security Act of 1974 ('ERISA'), as amended by the Consolidated Omnibus Budget Reconciliation Act ('COBRA')." *Id.*

Additionally, Ardagh argues that "Bell cannot show Ardagh prematurely discontinued her health insurance benefits" and that Bell's claim that she "never received COBRA benefit paperwork via US Postal Mail" should fail because "[t]he law does not require that an employee actually receive the notice, as long as the notice was sent in a good faith manner reasonably calculated to reach the former employee." *Id.* at 19.

In response, Bell contends that her claim under Indiana Code section 27-8-15-31.1 survives because she is not suing under a private right of action in that statute, but instead under a Title VII civil rights case (Filing No. 61 at 28). Bell argues that her benefits were cancelled even though

she had already paid for them. *Id*. Specifically, she contends that her "benefits should have extended to May 15, 2018 (the last check that withheld insurance)" and thus, her "benefits should have extended to May 15, 2018, not cut off as of May 7, 2018 [her termination date]." *Id*. Bell also argues that Ardagh violated ERISA by cancelling her benefits and still charging her for them because Ardagh "actually harmed her because she nor her family could seek medical attention as per the administered plan." *Id*. at 29. Regarding the COBRA notice, Bell asserts that "the defense cannot show that Bell was ever given the information to sign up for COBRA, nor can they prove Cobra paperwork was actually mailed to Bell." *Id*.

Ardagh replies that "[t]o prove Ardagh's actions violated Title VII, she would have to demonstrate Ardagh ended her health insurance benefits . . . because of her race." (Filing No. 62 at 21.) Ardagh asserts that it always discontinues health insurance benefits on an employee's last day, and "Bell has not shown her benefits discontinuation on the date of her termination violated ERISA" because "[e]mployers are permitted to discontinue benefits if an employee is terminated, and Bell has not otherwise established that Ardagh's group health plan required it to continue benefits after employment ends." *Id.* (citing *Williams v. Wellman Thermal Systems Corp.*, 684 F.Supp. 584, 592 (S.D. Ind. April 14, 1998)). As to the COBRA paperwork, Ardagh argues it "submitted unrefuted evidence the COBRA notice was mailed by its vendor to Bell" and that, under COBRA, this is all that was required of it to do. *Id.* (citing *Powell v. Paterno Imps., Ltd.*, 2004 U.S. Dist. LEXIS 21274 *22-23 (N.D. Ill. Oct. 27, 2004)).

The Court is persuaded. Even assuming Bell has a private right of action to bring this claim, and that Ardagh is a "small employer" as contemplated by the statute, Bell was not eligible to receive continuing benefits because she did not work for Ardagh for the statute's requisite year. The undisputed evidence shows that Bell was employed by Ardagh from August 7, 2017 to May

7, 2018 (Filing No. 58 at 18). The designated evidence shows that despite the claims of acrimonious racial motivation argued in her response brief—Ardagh followed its typical process in discontinuing Bell's benefits. Pursuant to Ardagh's group health plan, health insurance benefits are always discontinued on the date of the employee's termination. (Filing No. 58-6 at 2.)

As for Bell's allegation that Ardagh failed to provide her with notice of continuing coverage under the statute, that claim is preempted by COBRA, *see* 29 U.S.C. § 1144; 29 U.S.C. § 1161, and the evidence shows that the insurance provider sent a COBRA Coverage Election Notice to Bell's address on record at the time of her termination (Filing No. 58-6 at 3, 10). This is all that this statute requires. *See* 29 U.S.C. § 1166; *Pierce v. Visteon Corp.*, 843 F. Supp. 2d 936, 940 (S.D. Ind. 2011) ("[W]hether the former employee actually received the notice is not the focus of the Court's inquiry. Instead, the Court must consider whether . . . [the defendant] caused the notice to be sent in a good faith manner reasonably calculated to reach the former employee.") (quotation omitted). Sending notice to Bell's address on file was clearly "reasonably calculated" to reach her.

For the foregoing reasons, the Court **grants** Ardagh's summary judgment motion with respect to Bell's Indiana Code § 27-8-15-31.1 claim.

## IV.    CONCLUSION

The Seventh Circuit has described summary judgment as the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). For the reasons stated above, the Court **GRANTS** Ardagh's Motion for Summary Judgment (Filing No. 57). Bell's claims are **dismissed with prejudice**, and Final Judgment will issue under separate order.

**SO ORDERED.**

Date:  3/19/2021

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Antoinette Takia Bell
12240 Misty Way
Indianapolis, Indiana  46236

Brian L. McDermott
JACKSON LEWIS PC (Indianapolis)
brian.mcdermott@jacksonlewis.com

Caitlin S. Schroeder
JACKSON LEWIS PC (Indianapolis)
caitlin.schroeder@jacksonlewis.com

Melissa K. Taft
JACKSON LEWIS PC (Indianapolis)
melissa.taft@jacksonlewis.com